**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ANDREW LAMONT BROWN,

*Petitioner-Appellant*,

v.

RONALD BROOMFIELD, Acting
Warden, San Quentin State Prison,

*Respondent-Appellee*.

No.21-99001

D.C. No.  2:04-cv-03931-JVS

OPINION

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted September 10, 2025
San Francisco, California

Filed August 14, 2026

Before:  Richard R. Clifton, Jacqueline H. Nguyen, and
Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge Sanchez

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Andrew Lamont Brown's petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his California conviction and death sentence for first-degree murder.

The district court granted a certificate of appealability (COA) as to Brown's claims that he received ineffective assistance of counsel during the penalty phase of his trial, that he was incompetent to stand trial, and that he has an intellectual disability that renders him ineligible for execution under the Eighth Amendment. Brown sought to expand the certificate of appealability to include three additional claims. The panel applied the deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA).

Brown's certified claim of ineffective assistance at the penalty phase contained numerous subclaims raising two general areas of concern: the failure to investigate and present important mitigation and evidence, and the failure to rebut uncharged acts introduced against Brown and to object to evidence and arguments raised by state prosecutors.

- The panel held that the California Supreme Court could have reasonably determined that Brown failed to make a prima facie claim of ineffective assistance because there was no evidence that trial counsel

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

failed to investigate or make reasonable strategic choices about Brown's history of drug and alcohol abuse; mental health conditions; family history of abuse and neglect; gang ties; and poverty and neighborhood history. Much of the new evidence presented by Brown in his postconviction petitions was cumulative of the evidence trial counsel already presented at the penalty phase. Where trial counsel did not present or focus on certain evidence, the record reflects that these were strategic decisions by trial counsel. Therefore, the California Supreme Court could have reasonably concluded that trial counsel did not render deficient performance. In light of the doubly deferential standard of review under AEDPA, the panel could not conclude that the California Supreme Court's rejection of Brown's ineffective assistance claim was objectively unreasonable.

- The panel held that in view of the trial record in which counsel presented several witnesses to refute the State's evidence that Brown perpetrated the uncharged offenses, the California Supreme Court reasonably rejected Brown's claims that trial counsel was ineffective for failing to call two individuals as rebuttal witnesses; and that counsel was not deficient in failing to present at the penalty phase certain of Brown's positive qualities, in failing to request a jury instruction defining and clarifying life without parole, or in failing to object to or rebut the prosecutor's argument at closing that Brown was a "sociopath" who lacked remorse and would kill again.

- Because counsel's performance was not deficient, the panel did not address whether Brown was prejudiced by any deficiency.

The panel held that based on the totality of the evidence, the California Supreme Court did not make an unreasonable factual determination that Brown failed to rebut the presumption that he was competent to stand trial.

The panel held that the California Supreme Court reasonably determined that Brown failed to make a prima facie showing of intellectual disability under California's statutory test.

The panel declined to expand the COA to include three uncertified claims in which Brown alleged (1) counsel's ineffective assistance at the guilt phase, (2) the discriminatory exclusion of a prospective black juror, and (3) the denial of a jury drawn from a fair cross-section of the community.

## COUNSEL

Saivandana Peterson (argued), Nicole Jeong, and Susel B. Carrillo-Orellana, Deputy Federal Public Defenders; Cuauhtémoc Ortega, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

Vincent P. LaPietra (argued) and Lise Jacobson, Deputy Attorneys General; Holly D. Wilkens, Supervising Deputy Attorney General; James W. Bilderback II, Senior Assistant Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, San Diego, California; for Respondent-Appellee.

## OPINION

SANCHEZ, Circuit Judge:

On March 5, 1992, Andrew Lamont Brown was sentenced to death after a California jury convicted him of first-degree murder and robbery and found true the special circumstance that he had killed Christina Ramirez while engaging in robbery and with the personal use of a firearm. After Brown was denied relief on direct appeal and in state post-conviction proceedings, he filed the instant petition for writ of habeas corpus under 28 U.S.C. § 2254. The district court denied his petition but granted a certificate of appealability as to Brown's claims that he had received ineffective assistance of counsel during the penalty phase of his trial, that he was incompetent to stand trial, and that he has an intellectual disability that renders him ineligible for execution under the Eighth Amendment. Brown challenges the district court's denial of habeas relief and seeks to expand the certificate of appealability to include three additional claims. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253. We affirm the district court's denial of Brown's habeas petition and decline to expand the certificate of appealability.

## I. BACKGROUND

The facts, as set forth by the California Supreme Court on direct review in *People v. Brown*, 73 P.3d 1137, 1147–53 (Cal. 2003), are summarized as follows.

### A. Guilt Phase

In November 1988, Andrew Lamont Brown was determined to steal deep-dish tire rims from a truck. At the time, Brown was living "off and on" in a home with Mark

Bender, Broderick Fields, Andrew White, Percell McClendon, and others.  Brown asked Levi Gardner if he wanted to buy some deep-dish tire rims.  Gardner replied that he would have to see them before committing to the purchase, and Brown said he could obtain some.  Brown told White that he "was going to do a jack move"—rob someone at gunpoint—"to get some rims," and invited White to join him.  White declined.

On November 11, 1988, Brown, Fields, Bender, and McClendon drove around in Bender's Oldsmobile Cutlass, looking for deep-dish rims to steal.  That night, seventeen-year-old Christina Ramirez was driving her husband's 1985 red Nissan truck which had a Kenwood brand stereo and amplifier and distinctive deep-dish tire rims, each bearing small decorative holes and painted red to match the truck.  Brown spotted Ramirez's truck and exclaimed, "[t]hose are the ones we need."  They made a U-turn and followed the red truck for two traffic lights.  Ramirez was driving alone in the truck.  When she stopped at a red light, Bender pulled up behind her.  According to McClendon's testimony, Brown jumped out carrying a .38-caliber pistol, ran to the driver's side of the red truck, and fired one shot through the window, shattering it.  Brown then pulled Ramirez out and got into the truck from the driver's side, while Fields got in from the passenger side.  The two cars left the scene.

Several individuals witnessed the incident.  Juan Williams, whose Mercedes Benz stopped directly behind Bender's Cutlass, described seeing a young Hispanic male between five feet three inches and five feet six inches tall running up to the driver's side of the red truck, throwing the victim from the truck, and driving off in it.  Williams testified that he did not see a second man enter the truck on the passenger side, although a police officer later testified at

trial that, on the night of the murder, Williams reported seeing two men running up to the truck.

Rena Stanfill's car was stopped at the red light behind Williams' Mercedes.  Stanfill saw two men exit from a mid-sized "American car" in front of the Mercedes and run to the red pickup truck.  According to Stanfill, an African American man about five feet ten inches tall ran to the driver's side of the truck and pulled a woman out, dropping her so that she struck the pavement face-first.[1]  A second man, who was either Hispanic or African American, jumped into the passenger side of the truck.  Stanfill saw the two men leave the scene in the truck.  Because she was driving with her windows rolled up and radio on, Stanfill did not hear the gunshot.

Ramirez suffered a single gunshot wound to the neck. The bullet entered the left side of her neck, traveled downward, and lodged in her spine.  Ramirez died from her injuries on December 21, 1988.  The bullet retrieved from her body was consistent with having been fired from a .38-caliber handgun.

Around 11:45 pm that night, Mark Bender, Fields, and McClendon arrived at Perry Bender's home.  Mark was visibly upset and blurted out: "I know he shot her.  I know she is hurt bad."  Soon after, Brown arrived in Ramirez's red truck, playing loud music on the stereo.  Brown had a .38-caliber handgun.  When Perry asked how he had obtained the truck, Brown replied that he gotten it in Riverside and that he "[s]moked the bitch."  Sometime between 11:00 p.m. and 1:00 a.m., Gardner's brother saw Brown sitting in a red truck

---

[1] Brown and Broderick Fields are both African American and stand approximately six feet tall.

with a camper shell and deep-dish rims in front of Harb's Liquor Store/Market, the stereo playing loudly. Brown asked him to tell Levi Gardner that he had some "deeps" for Gardner.

The next day, Brown offered to sell a single deep-dish rim to Gardner for $50. The rim was painted red and had circular holes in it. Gardner asked to see all four rims before committing to the purchase, so they drove to a remote location in the hills and came upon a red pickup truck down a dirt road. The truck had deep-dish rims and was missing one from the front. Gardner had a "bad feeling" about the deal and declined to buy the rims. Brown offered to lower the price if Gardner helped him remove the other three rims, but Gardner declined.

Kevin Davis testified that he had seen the red truck in the Mead Valley hills in November 1988, had seen Brown in a liquor store parking lot with a rim matching those on Ramirez's truck, and had seen Brown with a .38-caliber handgun. Brown offered to sell Davis a Kenwood brand car stereo, amplifier, and speakers, but he declined.

The day after the robbery, Brown, White, and a crowd of people gathered in front of a liquor store in the early evening. According to White, Brown described to the group how he had acquired the red pickup truck, stating he "smoked the bitch" who was driving it. When the group expressed skepticism, Brown swore it was true and invoked his gang, Fruit Town, as proof. Brown asked White to help him remove the rims. Although White had experience in such matters as a car thief, he declined to help because he heard that Brown had shot a person to obtain the truck.

Acting on a tip, the Riverside County Sheriff's Department located and towed Ramirez's truck from the

hills. It was missing one wheel and all of its stereo components. Police found heavy scratch marks around the lug nuts, which suggested that someone had tried to remove the remaining wheels with the wrong tool. Blood was discovered in the door jamb on the driver's side. Brown confronted Rick Kinney, an acquaintance, about the truck's disappearance, saying: "Where's my truck at? I took that truck that you're riding around today, that red truck in the hills, that was mine."

Brown was charged with robbery and first degree murder with special circumstances. At trial, defense counsel presented a theory that Brown was not the shooter, relying on the recollections of two eyewitnesses, Williams and Stanfill, who initially recalled that the shooter was a Hispanic man, not a Black man. Noting that Fields was related to the Bender brothers, defense counsel asserted that the other participants in the crime had closer relationships to each other and suggested they were protecting themselves by pointing the finger at Brown as the shooter.

The jury convicted Brown in 1992, finding true a special circumstance allegation that Brown committed the murder while engaged in the commission of a robbery, and two enhancement allegations that Brown personally used a firearm in the commission of his crimes.

## B. Penalty Phase

### 1. Evidence in Aggravation

The State presented testimony from several witnesses describing five other uncharged violent offenses allegedly committed by Brown in the same year as the underlying murder. Three of the alleged crimes involved a carjacking or attempted carjacking by Brown and others using a .38-

caliber handgun, and one of those robberies resulted in the shooting death of a victim. The uncharged offenses are discussed in more detail *infra* pp. 38–42.

The State also presented testimony from the victim's family. Susie Barraza, Christina Ramirez's mother, testified that Christina was seventeen years old when she was shot and killed. Christina and her husband Joe had gotten married less than a month before the crime, and their wedding reception was scheduled for the day after the shooting. After Christina's death, her mother became afraid to venture out at night and began therapy. Maria Ramirez, Christina's mother-in-law, testified that nothing was the same after Christina's death. Her son Joe became depressed, stopped working, and obtained several guns. He stayed in his bedroom for nearly a year, coming out only to eat and go to the bathroom. After threatening suicide and displaying anger, Joe was committed for observation and counseling. Maria and her husband never strayed far from home in order to keep watch over their son.

### 2. *Evidence in Mitigation*

Brown did not testify at the penalty phase but called several witnesses to raise doubt about his involvement in the uncharged offenses and to present evidence about his childhood abuse and neglect, mental health issues and substance abuse, and chaotic upbringing. Mitigation witnesses included family and friends, a former Department of Social Services ("DSS") employee, a former principal, and three expert witnesses.

Several witnesses testified to the severe physical and psychological abuse Brown witnessed and experienced as a child. Brown's mother, Catherine Williams, testified that she gave birth to him when she was sixteen years old. They

lived with his father Oscar Brown, who often struck Williams. Catherine left Oscar after he fired a gun at her while she was holding Brown. Wesley Armstrong, Brown's uncle, testified that when Brown was five or six years old, Armstrong went to Catherine's apartment and found Brown alone and apparently crying in a dark closet with the door closed. Later, Brown appeared to be in pain and had bruises and open wounds on his back, as though he had been whipped with an electrical cord or clothes hanger. Brown was later removed from his mother's custody and placed with a foster family and then with his grandmother, Lula Armstrong McMaryion, under whose care he remained until he turned 17 or 18 years old.

When Brown was in kindergarten, a school nurse filed a report indicating that he had old scars on his back and the front of his chest and thighs, some swollen and discolored areas, old scars on and under the surface of his penis, and scabs. Brown explained that his mother's friend "RC" had whipped him with an extension cord. The report noted that his mother Catherine told Brown the whippings were good for him.

Geneva Cofield, Brown's foster parent, and her daughter Kay testified that when five-year-old Brown came to live with them, he looked unhealthy, malnourished, and had physical injuries that covered most of his body. Some injuries were old and some were new, and included cigarette burns, wounds on his penis, back and buttocks, and injuries that would take up to six weeks to heal. The injuries were reportedly inflicted by Catherine's then-boyfriend, "RC" or Ricardo Laurie.

Defense expert psychiatrist Dr. Chin Choo testified that when she was a psychiatry resident at the Martin Luther

King Medical Center, she evaluated a seventeen-year-old Brown who had been admitted to the emergency room. On January 16, 1987, Brown was delusional, disoriented, and psychotic, and stated that he had smoked Sherman cigarettes, *i.e.*, cigarettes laced with phencyclidine, or "PCP." Dr. Choo prescribed Haldol, a psychotropic drug used to correct symptoms of psychosis but could not confirm that it was administered. Hospital notes recorded that Brown said he was paranoid, had used cocaine, and needed sleep. The next day, Brown was alert and cooperative and admitted to drug use. His behavior was consistent with someone coming down from a psychotic state. Dr. Choo testified that Brown's psychosis could have been the result of his PCP use.

Defense expert Dr. Nancy Kaser-Boyd, a clinical psychologist, offered her opinion about the severity of Brown's childhood abuse, the effects from it, and the treatments Brown should have received. To form her opinion, she reviewed Brown's DSS records, school records, IQ testing done by neuropsychologist Dr. Vincent Nunno, and interviews with family members. She also conducted personal interviews of Brown and his family members. Dr. Kaser-Boyd testified that Brown was one of the most physically abused children she had ever seen. In addition to the beatings and burnings, Brown was subjected to psychological abuse, including being locked in a dark closet and having his clothes taken away so he could not escape. Dr. Kaser-Boyd opined that Brown showed symptoms of posttraumatic stress disorder ("PTSD") and explained that children who have suffered a similar level of abuse and trauma generally cannot develop normally either cognitively or emotionally. Such children are at higher risk for drug and

alcohol abuse and have a much greater degree of anxiety and depression.

Brown's background was consistent with his low school performance and IQ. Tests revealed that his IQ of 77 was within the borderline intelligence level between low average and intellectually disabled. Brown attended six different schools between seventh and eleventh grade because his grandmother allowed him to switch school to be with his friends. Dr. Kaser-Boyd opined that Brown should have been placed in special education in light of his cognitive deficits, hyperactivity, and the trauma he had suffered, but his grandmother was not sophisticated enough to attend to Brown's special needs.

Dr. Kaser-Boyd also opined that with Brown's history of abuse and trauma, he needed long-term therapy. Though Catherine was told that Brown was hyperactive, she never sought treatment for him. Similarly, school and DSS officials told his grandmother Lula that Brown needed professional counseling, and needed to be placed in special education and to receive treatment for his hyperactivity. Lula did not follow up on these recommendations. Dr. Kaser-Boyd testified that Brown did not have an available or appropriate adult role model or mentor.

Defense expert Dr. James H. Johnson, Jr., geography professor and director of the Center of Urban Poverty for Los Angeles County at the University of California, Los Angeles, testified about the educational, financial, and professional disadvantages for young black males in Compton where Brown grew up. Several witnesses also testified about the dangerous neighborhood where Brown was raised on Piru Street in Compton. The neighborhood was a center of drug-dealing and gang activity, with daily

shootings and other criminal activity.  Brown and his grandmother often slept on the floor because they were afraid that gunshots would come through the windows.

### 3.  Rebuttal Evidence and Closing Arguments

In rebuttal, the State presented Sandra Thomas, who met Brown in 1987 and viewed him like a little brother.  Brown told her about the robberies he committed, like stealing a Suzuki and a Nissan, stripping them down, and selling them. Once she and Brown saw a Suzuki drive by and he said, "I'm going to get that bitch . . . . I'm jacking that."  Thomas described Brown as appearing happy when he talked about robbing people.

In closing argument, the prosecutor reviewed the nature and circumstances of the crime and reminded the jury that it had rejected the defense's argument at the guilt phase that Brown was intoxicated on the night of Ramirez's murder. The prosecutor also explained that Brown would get excited about robbing people, did not express remorse and instead bragged about the murder, and made conscious decisions to commit the murder and the uncharged crimes.  The prosecutor argued that Brown would be a danger to society if he were sentenced to life without parole ("LWOP"), that Brown "is not suffering from mental disease other than being a sociopath," and described Brown as a "sociopath on substance abuse" who did not deserve sympathy or mercy.

The defense argued in closing that the jury should not only be angry with Brown but also with the people who failed him.  Defense counsel explained that the murder and the uncharged crimes were committed by the same group, and because of Brown's low IQ and early substance abuse, it was unlikely that he was the ringleader.  Counsel also stated that it was not Brown's choice to be abused, to grow

up in a hopeless and violent neighborhood, and to receive none of the adult guidance, education, or mental health treatment he needed. Counsel explained that Brown's breakdown and hospitalization at the age of seventeen marked the beginning of his involvement in the one-year spree of uncharged crimes that ended in Ramirez's death.

The case went to the jury the afternoon of March 4, 1992. A verdict of death was returned the following day.

## II. PROCEDURAL HISTORY

The California Supreme Court affirmed Brown's conviction and death sentence on direct appeal. *Brown*, 73 P.3d 1137. In 2004, the United States Supreme Court denied certiorari. *Brown v. California*, 541 U.S. 1045 (2004). Brown filed his first state postconviction petition in 2004.

Brown initiated this federal habeas proceeding on June 2, 2004, and filed his petition on May 16, 2005. The district court stayed federal habeas proceedings so that Brown could return to state court to exhaust his claims. Brown then filed a second state postconviction petition. On May 23, 2008, the California Supreme Court summarily denied both state postconviction petitions.

Brown then filed an amended federal habeas petition with the district court. On December 18, 2017, the district court denied Brown's motion for an evidentiary hearing, and on February 4, 2021, the district court denied Brown's petition on the merits. Brown timely appealed.

## III. STANDARD OF REVIEW

"We review a district court's denial of habeas relief de novo." *Grimes v. Phillips*, 105 F.4th 1159, 1165 (9th Cir. 2024). Because Brown filed his federal petition after April

24, 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA") governs our review. *Id.*; *see* 28 U.S.C. § 2254(d). Under AEDPA, we defer to a state court's decision on any claim that was adjudicated on the merits unless Brown demonstrates that the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

"We review the last reasoned state court decision." *Scott v. Broomfield*, 173 F.4th 1131, 1145 (9th Cir. 2026). Where there has been a summary denial by the California Supreme Court, we apply AEDPA deference to that determination. *See Ochoa v. Davis*, 50 F.4th 865, 888 (9th Cir. 2022) ("[T]he California Supreme Court's summary denial of [a petitioner's] claims—both certified and uncertified—is a decision on the merits and thus entitled to AEDPA deference."); *see also Cullen v. Pinholster*, 563 U.S. 170, 187 (2011) (holding that AEDPA deference "applies even where there has been a summary denial"). Under such circumstance, "a habeas court must determine what arguments or theories . . . could have supported [] the state court's decision . . . ." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

"Under California law, the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that 'the claims made in th[e]

petition do not state a prima facie case entitling the petitioner to relief.'" *Pinholster*, 563 U.S. at 188 n.12 (quoting *In re Clark*, 855 P.2d 729, 741 –42 (Cal. 1993)). The California Supreme Court "generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, and will also review the record of the trial to assess the merits of the petitioner's claims." *Id.* (cleaned up); *see also In re Figueroa*, 412 P.3d 356, 364 (Cal. 2018) ("This court evaluates a petition by asking whether, assuming the petition's factual allegations are true, the petitioner would be entitled to relief. If no prima facie case for relief is stated, the court will summarily deny the petition. If, however, the court finds the factual allegations, taken as true, establish a prima facie case for relief, the court will issue an order to show cause." (cleaned up)). For claims that were summarily denied, our review is not limited to whether the petitioner "had made out a prima facie case in his state habeas petition"; instead, we must evaluate the petitioner's claims "in their entirety to determine whether the California Supreme Court could reasonably reject those claims on the merits." *Montiel v. Chappell*, 43 F.4th 942, 957 n.13 (9th Cir. 2022).

## IV. CERTIFIED CLAIMS[2]

### A. Ineffective Assistance of Counsel at Penalty Phase— Claim 36

Brown asserts a certified claim of ineffective assistance of counsel at the penalty phase with numerous subclaims.

---

[2] The State argues that Brown is procedurally barred from receiving relief on his certified and uncertified claims. Because we do not find grounds to afford relief on the merits of Brown's claims, we decline to address whether procedural default would otherwise apply. *See Lewis v. Andes*, 95 F.4th 1166, 1185 n.11 (9th Cir. 2024); *see also Franklin v.*

His claim raises two general areas of concern about trial counsel's alleged ineffectiveness: the failure to investigate and present important mitigation evidence, and the failure to rebut uncharged acts introduced against Brown and to object to evidence and arguments raised by state prosecutors. Below, we address each of these assertions and their associated subclaims.

A defendant has a Sixth Amendment right to the effective assistance of counsel at the guilt and penalty phases of a capital trial. *Strickland v. Washington*, 466 U.S. 668, 684–87 (1984). To establish a claim of ineffective assistance of counsel, a petitioner must show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *Id.* at 687. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

To be deficient, a petitioner must show that his counsel's representation fell below an objective standard of "reasonableness under prevailing professional norms." *Id.* at 688. Federal courts apply a strong presumption that counsel's representation was "within the wide range of reasonable professional assistance." *Id.* at 689. The Supreme Court has not "articulate[d] specific guidelines for appropriate attorney conduct" but has instructed that the reasonableness of counsel's actions is assessed under the

---

*Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("[A]ppeals courts are empowered to, and in some cases should, reach the merits of habeas petitions if they are . . . clearly not meritorious despite an asserted procedural bar." (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997))).

prevailing professional norms at the time of the challenged actions, *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citation omitted), and in view of "counsel's perspective at the time," *Strickland*, 466 U.S. at 689. "Counsel in a death-penalty case has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Scott*, 173 F.4th at 1145 (quoting *Andrus v. Texas*, 590 U.S. 806, 814 (2020) (per curiam)). As the Supreme Court explains, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

Review of ineffective assistance claims under § 2254(d) is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "The question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether [it] was unreasonable—a substantially higher threshold.'" *Id.* (alteration in original) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)); *see also Richter*, 562 U.S. at 105 ("The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.").

### 1. Counsel's Failure to Investigate and Present Additional Mitigating Evidence at the Penalty Phase

We begin with Brown's claim that his trial counsel was deficient by failing to investigate and present important mitigating evidence during the penalty phase of his trial. Specifically, Brown contends that despite having information that would have caused competent counsel to investigate further, counsel failed to investigate and present evidence of Brown's drug and alcohol addictions, his mental decompensation in the year before the murder, history of family sexual and physical abuse, poverty and environmental conditions, and evidence that Brown was not affiliated with any gang.

With his state postconviction petition, Brown submitted three new expert declarations addressing evidence of mitigation that, according to Brown, should have been investigated and presented by trial counsel at the penalty phase. Dr. June Clausen reviewed documents regarding Brown's social, family, educational, and medical histories and provided a social history as well as psychological assessments of Brown in 2005 and 2008.[3] Dr. Pablo Stewart, a clinical and forensic psychiatrist, conducted a psychiatric assessment of Brown in 2007 based on Brown's documented social, medical, and psychiatric history as well as two interviews with Brown. Dr. Dale Watson, a psychologist specializing in forensic psychology, conducted tests and interviews of Brown in 2002 to evaluate his neuropsychological functioning. The new mitigation evidence also included lay witness declarations from family

---

[3] Dr. Clausen did not interview Brown as part of her evaluation.

and friends that supported the experts' summaries of Brown's background.

Dr. Clausen examined Brown's family history of intergenerational neglect and child abuse. Brown's mother Catherine had inconsistent access to food and was beaten by her stepfather Laurence. Catherine was also sexually abused by Laurence. She became pregnant with Brown at 14 or 15 years old and was ill for most of her pregnancy and lacked any prenatal care. Catherine eventually moved in with Oscar Brown, who was physically abusive of both Catherine and Brown.

Dr. Clausen observed that Brown's early life was fraught with violence, and he experienced physical abuse as well as a deprivation of food, nurturing, and sense of stability. Brown "suffered physical abuse and neglect at the hands of his primary caretakers," and was removed from Catherine's care after school officials reported that he had been physically abused. He was placed into a foster home for approximately nine months. Although Brown saw a psychiatrist six times while in foster care, neither Catherine nor his grandmother Lula followed up on recommendations to treat Brown's hyperactivity or seek professional counseling for him.

Dr. Clausen also discussed the gang environment, violence, and poverty prevalent in Compton during Brown's childhood living on Piru Street. Brown was often chased and beaten by other children in the neighborhood, and appeared to be a victim of gang bullying. The community and family in which Brown was raised were poverty-stricken. For example, Dr. Clausen noted Brown's medical neglect and lack of access to prescription medication from medical providers to treat his conditions.

Agreeing with Dr. Kaser-Boyd, Dr. Clausen opined that "[n]o healthy and supportive adult was available" to guide Brown. Brown was neglected in every way by his caretakers, who lived in a chaotic environment and were not able to attend to his basic needs. Dr. Clausen opined that it was highly likely that Brown was also sexually abused by Laurence, which contributed to his lack of faith in adults. Because of the abuse and neglect, Brown's "development was arrested and his cognitive and emotional development impeded."

Childhood trauma also impacted Brown's academic performance and adolescent development. Brown attended at least eight schools from kindergarten through eleventh grade. The frequent change of schools and mental health problems negatively impacted his school performance and academic achievement. Brown received low test scores through sixth grade and performed even worse in middle and high school yet was permitted to progress on through grade levels. Despite his poor academic performance, Brown was never placed in special education classes.

Dr. Clausen also discussed Brown's lifelong substance abuse. Because Brown did not receive treatment despite showing symptoms of PTSD in early childhood and major depressive disorder in adolescence, he self-medicated with drugs and alcohol. Brown began drinking alcohol when he was around eight years old, using and selling marijuana and PCP at age thirteen, and by age sixteen, he was charged with felony possession of PCP and marijuana. Dr. Clausen reviewed reports from friends and family detailing that by the time Brown was sixteen, he was using large amounts of PCP and cocaine and was acting "crazy." Declarants reported that Brown had developed addictions to alcohol, marijuana, and cocaine and that he had become paranoid and

delusional. He thought people were trying to kill him and once tried to burn a tattoo from his body using a cigarette lighter. Brown tried to sell cocaine to make money but often used his own supply and would become desperate for more and steal or start a fight to get money. Dr. Clausen concluded that Brown's symptoms were consistent with anxiety disorder, mood disorder, psychotic disorder, and polysubstance dependence. Brown was genetically vulnerable to the development of psychiatric illnesses and substance abuse issues, and according to Dr. Clausen, Brown's substance abuse likely exacerbated his mental health conditions.

Dr. Stewart conducted a psychiatric assessment of Brown in April and May 2007 to identify the significant factors affecting his mental and psychological development and functioning and to render an opinion as to Brown's mental state at the time of the murder. Like Dr. Clausen, Dr. Stewart concluded that Brown was genetically vulnerable to the development of psychiatric illnesses and substance abuse issues based on the history of mental illness in his family. Dr. Stewart also agreed that Brown's substance abuse likely exacerbated his mental health symptoms. Brown's early use of alcohol and drugs was a common type of self-medication for survivors of childhood victimization. He noted that marijuana in high doses, which Brown was allegedly taking, when mixed with alcohol can cause hallucinations and delusions and that cocaine and that PCP can cause full-blown paranoid psychosis, agitation, and aggression.

Dr. Stewart opined that in 1987, the year before the underlying offense, Brown's "mental stability was noticeably compromised and he appears to have been decompensating at a fairly rapid rate. He began displaying signs of acute mental and emotional disturbance, including

depression, suicidality, extreme behavioral disorganization consistent with psychosis, and illogical thoughts and behavior."  Dr. Stewart noted Brown's hospitalization in January 1987 after attempting to drive off the road and that he appeared to be in a delusional and psychotic state when he presented at the emergency room.  Dr. Stewart also noted other psychotic episodes and extreme paranoia reported by Brown's family, including a return to the hospital the following month after Brown shot himself in the foot and his attempt to burn a tattoo from his body with a cigarette lighter.  By the summer of 1988, Brown was reportedly drinking heavily, using cocaine and marijuana on a daily basis, and regularly ingesting PCP.

Dr. Stewart concluded that at the time of the underlying offense, Brown "was suffering from extreme mental and emotional disturbances which may have compromised his ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law." His mental functioning was substantially impaired by "(1) the effects of stimulant-induced psychotic disorder, (2) his history of severe trauma and symptoms consistent with [PTSD], (3) chronic poly-substance abuse, and (4) likely long-standing mild organic dysfunction, with significant signs of executive function impairment."  Dr. Stewart believed that when Brown committed each of the offenses that the prosecutor introduced in aggravation at the penalty phase, he was suffering from extreme mental and emotional disturbances similar to those he was experiencing at the time of the murder.

Dr. Watson reviewed previous neurological tests administered to Brown in 1991 by neuropsychologist Dr. Vincent Nunno, and conducted new testing in 2001 and 2002 to assess Brown's neuropsychological functioning.  In a

neuropsychological battery test from 1991, Brown's full scale IQ score was 77, suggesting abnormal functioning of the brain and potential learning disabilities. According to Dr. Watson's additional testing, Brown's overall IQ fell within the average range at a score of 90, but his performance IQ was within the low average range, showing neurological dysfunction.

Dr. Watson found Brown to be mildly neurocognitively impaired with problems in higher order problem solving and executive functions, which suggests some disruption of frontal lobe functions. Dr. Watson explained that the characterization of Brown's impairments as "mild" means that his neuropsychological functioning is "significantly below average." Dr. Watson concluded that "Brown likely suffers from long-standing mild organic dysfunction, with significant signs of executive function impairment."

### a. Failure to Present Evidence of Alcohol and Substance Abuse

Brown sets forth a number of subclaims asserting that trial counsel was deficient in failing to investigate and present evidence during the penalty phase relevant to several areas of mitigation. Brown's first two subclaims are based on counsel's asserted failure to investigate and explain the cause and effects of his early, excessive, and long-term drinking and drug abuse. Brown relies upon *Porter v. McCollum*, 558 U.S. 30 (2009) and *Jackson v. Calderon*, 211 F.3d 1148 (9th Cir. 2000) to support the argument that long-term substance abuse is highly probative mitigating evidence. He further relies upon *Rompilla v. Beard*, 545 U.S. 374 (2005), and *Wiggins v. Smith*, 539 U.S. 510 (2003), in which the Court found prejudice as a result of counsel's

failure to adequately investigate and present mitigating evidence.

These cases are distinguishable because the state court record in those cases included evidence of the deficient investigations performed by counsel. *See Porter*, 558 U.S. at 39–40; *Rompilla*, 545 U.S. at 382–91; *Wiggins*, 539 U.S. at 517–18, 524–28; *Jackson*, 211 F.3d at 1161–63. Here, in contrast, Brown did not submit any declaration or evidence to show the scope of counsel's investigation, what avenues of investigation were pursued, whether counsel failed to follow up on any red flags, or whether counsel decided to cease further investigation based on what was discovered. More importantly, Brown cannot demonstrate that counsel was unaware of or failed to investigate Brown's substance abuse history. The record instead supports a determination that counsel conducted a reasonable investigation and made strategic decisions about how to present Brown's history of drug and alcohol use to the jury at the penalty phase. *See Strickland*, 466 U.S. at 690–91.

Counsel knew, based on defense investigator interviews, that when Brown was living in Compton and Perris, he was selling and smoking marijuana and PCP, using cocaine, and drinking alcohol. Counsel presented evidence about Brown's alcohol and substance use through Dr. Kaser-Boyd and Dr. Choo. Dr. Kaser-Boyd testified that Brown started drinking "heavily" from the age of nine, and that his substance abuse served to numb him to early abuse and dysfunction within his family. She explained that as a result of his childhood abuse and trauma, Brown showed symptoms of PTSD, had difficulty developing normally, and self-treated his anxiety and depression with drugs and alcohol. Dr. Choo testified that Brown was in a psychotic state when he was hospitalized after smoking cigarettes

laced with PCP, and that his psychosis could have been the result of his PCP use. There is thus no evidence in the record that Brown's trial counsel was unaware of or failed to investigate Brown's prior history of alcohol and drug use.

It is true that trial counsel did not focus extensively on his substance abuse, as was presented in postconviction reports from Dr. Clausen and Dr. Stewart. But tactical considerations supported trial counsel's apparent decision to avoid doing so. During voir dire, several jurors specified that they were "against all drug use" or had strong feelings about the use of illegal drugs. As Brown himself recognizes, his trial occurred at a time when large segments of society believed that the prevalence of crack cocaine had given rise to young, violent, and remorseless "super-predator[s]." Rather than focus on Brown's extensive alcohol and drug abuse and drug dealing to support his addictions, counsel had Dr. Kaser-Boyd emphasize that Brown used drugs and alcohol to relieve the pain from his childhood trauma. Trial counsel could have reasonably determined that highlighting extensive drug and alcohol use would be harmful rather than mitigating. *See Mayfield v. Woodford*, 270 F.3d 915, 931 n.17 (9th Cir. 2001) (en banc) ("We note that juries are unlikely to favor defenses based on abuse of dangerous drugs in evaluating a defendant's culpability for violent behavior."); *Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."). For these reasons, the California Supreme Court could have reasonably determined that counsel reasonably investigated and presented evidence about Brown's drug and alcohol abuse at the penalty phase.

### b.  Failure to Present Evidence of Mental Health

Brown next asserts that trial counsel failed to investigate known evidence of his mental conditions and failed to present and explain his mental health issues beyond age five, including those caused by his substance abuse and brain damage. According to Brown, the evidence presented by counsel was limited to Dr. Kaser-Boyd's testimony about Brown's early childhood and omitted vital information about his psychiatric decompensation in the two years leading up to the underlying offense.  Brown also argues that none of the testifying experts had the requisite expertise to opine on Brown's mental illness, impairments, or addictions.

Contrary to Brown's arguments, the record confirms that counsel reasonably investigated and presented evidence concerning Brown's mental health issues and brain condition at various points throughout his life through qualified expert opinions.  Dr. Choo described Brown's drug-induced psychotic episode which led to his admittance to a hospital at age seventeen.  Dr. Kaser-Boyd—a clinical psychologist who specialized in psychological assessment and family violence—also extensively testified to Brown's mental health issues.

Specifically, Dr. Kaser-Boyd testified that the abuse Brown endured prevented him from developing trust in adults, that Brown suffered secondary trauma because he observed abuse by his mother's male partners, and that his trauma was exacerbated by the drug dealing and shootings on Piru Street in Compton.  Dr. Kaser-Boyd explained to the jury that Brown's childhood trauma and upbringing resulted in developmental arrest, feelings of distrust and vulnerability, self-treatment through drug use and alcohol, PTSD, and lower school performance and IQ.  In addition,

counsel presented evidence that Brown was prescribed mental health treatment but never received it.

Brown contends that trial counsel was aware of "clear indicators" of brain damage, such as low academic achievement, learning disabilities, hyperactivity, and low IQ scores, but failed to present this evidence to the jury or to experts. The record belies his claim. Trial counsel investigated Brown's brain condition by retaining another expert, Dr. Nunno, who performed a variety of neurological tests on Brown in 1991. That counsel retained but did not present Dr. Nunno or his evaluation indicates that a strategic choice was made, which is entitled to a "strong presumption" of reasonableness. *Richter*, 562 U.S. at 104; *see also Dunn v. Reeves*, 594 U.S. 731, 740 (2021) (per curiam) (concluding under AEDPA that it was reasonable to find that counsel did not perform deficiently when they failed to hire a particular expert because "we simply do not know what information and considerations emerged as counsel reviewed the case and refined their strategy").

Trial counsel also presented through Dr. Kaser-Boyd that Brown had poor academic achievement, should have been placed in special education to help with his developmental delays in intellectual ability and attention deficits, had hyperactivity, a history of severe abuse, and possibly suffered from organic brain damage. Dr. Kaser-Boyd also conveyed Dr. Nunno's neurological findings from 1991 that Brown's full scale IQ score was 77, his verbal IQ score was 76, and his performance IQ score was 83, all within average ranges.[4] In short, the record does not support

---

[4] Contrary to Brown's allegation, Dr. Kaser-Boyd did not recommend further testing to determine if Brown suffered organic brain damage. She testified that she was not qualified to assess organic brain damage but

Brown's assertion that trial counsel failed to investigate and present evidence concerning brain damage and intellectual deficits.

Brown also contends that counsel failed to adduce evidence of his rapid mental decompensation in the two years before the murder, as reflected in Brown's drastic behavioral changes, daily substance use, and multiple delusional episodes. This presents a closer question, as admitting such evidence at the penalty phase would not have contradicted the defense theory that Brown suffered abuse, had untreated trauma, self-medicated with drugs and alcohol, had intellectual deficiencies, and was surrounded by a hopeless environment, which led to a psychotic breakdown at age seventeen. Such evidence could have allowed the jury to understand that Brown was suffering from extreme mental and emotional disturbances at the time he allegedly committed the underlying murder and other violent uncharged offenses introduced in aggravation by prosecutors.

As previously discussed, however, it appears that counsel strategically avoided focusing on Brown's daily drug use, selling drugs to support his addiction, and increasingly erratic and paranoid behavior because such evidence could have portrayed Brown in a more unsympathetic and dangerous light. As the Supreme Court explained in *Pinholster*, federal courts sitting in habeas must "affirmatively entertain the range of possible reasons [] counsel may have had for proceeding as they did." 563 U.S. at 196 (internal quotation marks omitted). The record here demonstrates that counsel presented two experts to testify

---

based on the results given by Dr. Nunno, there was an indication that Brown could be brain damaged.

about Brown's mental health condition and brain impairments at different points in his life, and retained but ultimately did not use another expert (Dr. Nunno) for reasons that are unclear.  *See Burt v. Titlow*, 571 U.S. 12, 23 (2013) ("It should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" (alteration in original) (quoting *Strickland*, 466 U.S. at 689)). These considerations as to how to present Brown's cognitive state to the jury reflected strategic decisions made after counsel engaged in a reasonable investigation and retention of experts.  *See Bell v. Cone*, 535 U.S. 685, 702 (2002).   Under the circumstances, we cannot conclude that the state court's dismissal of the ineffective assistance of counsel claim was objectively unreasonable.  *See Miles v. Ryan*, 713 F.3d 477, 487 (9th Cir. 2013) ("Because [counsel's] decision not to focus on drug addiction appears to have been motivated by reasonable strategic concerns, that decision is deserving of great deference under *Strickland* and *Pinholster*.").

### c. Failure to Present Evidence of Sexual and Physical Abuse of Brown's Mother

Brown's fourth subclaim is that counsel failed to adequately investigate and present evidence that Brown's grandmother Lula McMaryion and her partner, Laurence McMaryion, sexually and physically abused his mother Catherine for years and failed to follow up on the possibility that Laurence could be Brown's father.  In Brown's view, such evidence contradicted counsel's depiction of his caregivers as mostly loving and benign.

Trial counsel introduced substantial evidence of abuse and neglect by Brown's caregivers.   Several witnesses

testified about Brown having new and old wounds and scars when he was removed from his Catherine's home, that Catherine would steal Brown's clothes and lock the door so that he could not leave, that Ricardo Laurie burned Brown with cigarettes and whipped him with electrical cords, that Brown was once found locked in a dark closet, that Brown was afraid to ask Catherine for food because he did not want to get whipped, and that the injuries Brown sustained likely occurred over a period of time indicating a pattern of abuse. Dr. Kaser-Boyd testified that Brown was one of the most physically abused children she had ever seen and had been subjected to physical and psychological abuse that later manifested in symptoms of PTSD.

As to Lula and Laurence's abuse of Catherine specifically, counsel presented testimony at the penalty phase that Catherine was physically abused by Lula and Laurence; that Laurence frequently physically abused Lula's children when they were younger and, at that time, was emotionally unpredictable; and that Catherine eventually sought and received therapy to deal with the abuse she suffered.[5]  Counsel also investigated whether Lula or Laurence abused Brown and apparently did not obtain information leading to a stronger possibility of physical or sexual abuse.

Given the extensive evidence of Brown's own abuse and neglect, additional evidence of abuse suffered by Catherine is largely cumulative of the evidence defense counsel already introduced. Brown does not therefore demonstrate that counsel's investigation was deficient, nor that the

---

[5] As Brown notes, counsel possessed information from defense investigator interviews that Laurence had sexually abused Catherine. That information was not presented during the penalty phase.

decision to limit the evidence regarding multigenerational abuse was unreasonable.

### d. Failure to Present Poverty and Neighborhood Evidence

Brown contends that while counsel knew that Brown grew up in poverty, counsel should have further investigated and presented the testimony of a social historian to better explain Brown's childhood home on Piru Street. Because the record does not contain information to support the allegation that counsel did not investigate or obtain information regarding Brown's family history of poverty and neglect, Brown fails to demonstrate that counsel performed deficiently. *See Titlow*, 571 U.S. at 23.

Contrary to Brown's allegations, counsel did introduce evidence of Compton's decline when Brown lived with Lula and Laurence as well as specific evidence of conditions on Piru Street. Dr. Johnson testified about the violence common in Compton and how the lack of opportunities affected black males like Brown. His testimony described a mass exodus from the loss of jobs in the city between 1975 and 1988, mass unemployment, and a sharp increase in violent crimes. Additionally, trial counsel marked three photos of Lula's house on Piru Street, Catherine identified them in her testimony, and the court admitted them into evidence.

Brown faults trial counsel for presenting only generic evidence from Dr. Johnson, but counsel also presented specific testimony from Brown's uncle Wesley Armstrong and Lula. Brown's uncle grew up in Compton but left in 1979 when he was 20 years old because it had started to change into a place with frequent shootings and robberies. Wesley testified that he would return to Compton almost

every weekend and wanted Lula and Laurence to move from Piru Street because it was too rough and they could not safely walk to their mailbox or be in their yard.  Lula also testified that when Brown was growing up on Piru Street, fighting and shootings were prolific in the neighborhood and violence occurred on the street.

Because Brown does not specify other relevant evidence that counsel neglected to discover, we are not persuaded that counsel rendered a deficient portrait of life on Piru Street and the community violence and poverty that Brown experienced.  The decision to present Dr. Johnson's testimony in lieu of a social historian does not suggest deficiencies "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687; *see Sanchez v. Davis*, 994 F.3d 1129, 1148 (9th Cir. 2021) ("The choice of what type of expert to use, however, is one of trial strategy and deserves a heavy measure of deference.") (internal quotation marks omitted).  Accordingly, the California Supreme Court could have reasonably determined that these conclusory assertions did not state a prima facie case of ineffective assistance of counsel.

### e.  Failure to Present Evidence About Gang Non-Affiliation

Brown's next subclaim asserts that counsel was deficient for not investigating and presenting evidence that Brown was not a gang member and was in fact regularly victimized by gangs.  To support this claim, Brown points out that counsel knew that Brown's cousin had stated that Brown was not affiliated with the "Bloods," and that Lula permitted Brown to switch schools often because he was unhappy with the other children or felt threatened by the environment.

However, the record supports a finding that counsel conducted a reasonable investigation and decided not to focus on gang affiliation.

Prior to trial, counsel had information that Brown bragged about being a Fruit Town gang member and hung out on the corner with gang members and dressed like them. Before opening statements during the guilt phase, counsel sought to exclude any mention of gangs as a strategic matter. The prosecutor requested, however, that the trial court permit limited gang testimony by allowing a witness to testify in the guilt phase that when Brown bragged about having "smoked the bitch," Brown "was putting this on Fruit Town," his gang, which meant he was swearing an oath that he was telling the truth. The trial court determined that those limited statements were more probative than prejudicial and permitted the prosecutor to introduce them. No other evidence about gangs was presented during the guilt phase. At the penalty phase, counsel did present evidence from which it could be inferred that Brown was afraid of certain gangs and changed schools because of his conflicts with them.

Because introducing evidence about Brown's relationship with gangs would have opened the door for the prosecution to introduce rebuttal evidence that Brown may have been a gang member, counsel's decision to not present further evidence was a strategic choice that "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Based on the potential for prejudice, this appears to be a situation where counsel reasonably and strategically decided to minimize testimony and evidence regarding Brown's possible gang affiliation rather than direct the jury to resolve the question of whether Brown was a gang member. *See Williams v. Woodford*, 384

F.3d 567, 618 (9th Cir. 2004) (determining that trial counsel did not render ineffective assistance by failing to present mitigation evidence that would have opened the door to rebuttal evidence regarding gang membership).

### f.  Failure to Prepare and Examine Experts

Brown argues that counsel improperly selected experts for the penalty phase and failed to adequately prepare and examine them.  He states that instead of calling Drs. Kaser-Boyd, Choo, and Johnson, counsel should have hired a social historian, and mental health and gang experts.  Brown's argument hinges on the idea that if he had better experts, he would have had a more favorable outcome.

However, the selection of the type of expert to use is entitled to deference as a matter of trial strategy.  *See Sanchez*, 994 F.3d at 1148.  Dr. Kaser-Boyd was a mental health expert with expertise in forensic psychology, family violence, and child abuse—areas central to Brown's mitigation theory.  Dr. Choo testified because she was the attending physician when Brown was hospitalized for a psychotic episode.  Dr. Johnson spoke to the socioeconomic, educational, and professional hardships young black males like Brown experienced growing up in Compton.  And as discussed, it was reasonable for counsel not to retain a gang expert to avoid opening the door to prejudicial rebuttal evidence concerning Brown's possible gang affiliation.

Brown contends that trial counsel failed to prepare and examine the experts, but he does not specify what counsel should have done differently to prepare them.  Moreover, Brown's argument that counsel's investigation and preparation caused his experts to undermine his defense theory is belied by the record.  Counsel's mitigation strategy was to show that Brown suffered a traumatic and abusive

childhood and that despite recommendations for counseling and signs that Brown struggled in school with a low IQ, Brown never received the mental health treatment or academic support that he needed.  Instead, Brown grew up in an area rife with violence and lack of opportunity, and as a result of this chaotic environment, Brown self-medicated with drugs and alcohol.  Counsel argued that a combination of these factors eventually caused Brown to have a psychotic breakdown a year before the underlying offense.  The three experts at trial all supported this theory:  Dr. Kaser-Boyd spoke to Brown's trauma and mental health issues resulting from his childhood and why Brown resorted to drugs and alcohol, Dr. Johnson spoke to the violence and economic strife in Brown's neighborhood in Compton, and Dr. Choo described Brown's psychiatric hospitalization.

***

In sum, the California Supreme Court could have reasonably determined that Brown failed to make a prima facie claim of ineffective assistance of counsel because there was no evidence that trial counsel failed to investigate or make reasonable strategic choices about Brown's history of drug and alcohol abuse; mental health conditions; family history of abuse and neglect; gang ties; and poverty and neighborhood history.  As the State points out, much of the new evidence presented by Brown in his postconviction petitions was cumulative of the evidence trial counsel already presented at the penalty phase.  Where trial counsel did not present or focus on certain evidence, such as Brown's chronic substance use, gang non-affiliation, or other episodes of paranoid and erratic behavior, the record reflects that these were strategic decisions by trial counsel.  Therefore, the California Supreme Court could have reasonably concluded that trial counsel did not render

deficient performance.  *See Strickland*, 466 U.S. at 690.  In light of our "doubly deferential" standard of AEDPA review, *Knowles,* 556 U.S. at 123, we cannot conclude that the California Supreme Court's rejection of Brown's ineffective assistance claim was objectively unreasonable.

## 2.  Other Claims of Deficient Performance at the Penalty Phase

Brown also contends that trial counsel was ineffective for failing to: (a) rebut the uncharged acts introduced against Brown during the penalty phase; and (b) failing to present Brown's positive qualities, failing to request an LWOP jury instruction, and failing to object to closing arguments made by the prosecution.

### a.  Failure to Rebut Evidence of Uncharged Crimes

As evidence in aggravation, the State presented several witnesses to testify about five uncharged violent offenses allegedly committed by Brown in the year leading up to the murder of Christina Ramirez.

On November 14, 1987, Brown was riding in a Chevy Blazer with Willie Woods when they spotted a Suzuki Samurai with deep-dish rims and followed the car to Sunnymead Park (the "Sunnymead incident").  Danny Coria drove the car with his friend Simon Mireles in the passenger seat.  Either Brown or Woods yelled at them to get out of the car and fired a shot, striking Coria in the arm and breaking it.  Coria and Mireles fled on foot.  Although Coria initially identified Woods as the shooter at the preliminary hearing, he was unsure by the time of trial who the shooter was.  Woods admitted at trial that he had pleaded guilty to attempted murder and use of a gun and infliction of great

bodily injury for the robbery, yet testified that Brown was the shooter.[6]

The next day, on November 15, 1987, Francisco Carillo drove to Castle Park in Riverside with his brother and three others. Carillo was driving a 1979 Grand Prix. At around midnight, a Chevy Blazer driven by Woods and accompanied by Brown and Kevin Davis pulled alongside the Grand Prix. Brown jumped out of the car and shot Carillo in the arm ("Castle Park incident"). The bullet passed through his chest and heart, killing him. Davis positively identified Brown as the shooter.

On January 12, 1988, Brown was living with his girlfriend, Flecia Bennett, and their two children when an argument ensued between the couple. Brown struck Bennett in the mouth, drawing blood. Bennett responded by hitting Brown in the head with a chair. Brown drew a .38-caliber handgun, pointed it at Bennett's face, and said, "Bitch, I'm going to kill you." Brown was not prosecuted because Bennett dropped the charges. Bennett claimed that she did not believe that Brown actually wanted to kill her.

On January 27, 1988, Brown brandished a large knife at a hotel desk clerk, Sharon Lee Baker, demanding all her money. After Baker convinced Brown to leave, he threatened to come back with a gun and kill her. A few days later, he came back with a woman and two children asking

---

[6] The November 14 (Sunnymead incident) and November 15 (Castle Park incident) crimes occurred in 1987, not 1988 as described in the California Supreme Court's opinion on direct appeal, *Brown*, 73 P.3d at 1150. Both parties describe these incidents as having occurred in November 1987, and the district court's order, Brown's federal habeas petition, the trial transcripts, and closing arguments confirm that both incidents occurred in 1987.

to rent a room.  The police were called and arrested Brown.
Brown argues that he did not match the age or weight of the
attacker, and notes that Baker could not identify Brown in a
photographic lineup.

On November 5, 1988, six days before Christina
Ramirez was shot, Brown, Broderick Fields, Mark Bender,
and Percell McClendon were driving when they noticed an
Oldsmobile Cutlass Supreme with straight-lace rims at a gas
station.  The car was occupied by two teenage girls, Gloria
Alonza[7] and Monica Rodriguez, while the driver Danny
Alcaraz was looking under the hood.  Brown allegedly
pointed a .38-caliber handgun at the girls and ordered them
out of the car.  After they fled, Brown and Fields got into the
car and drove away.  McClendon testified against Brown and
identified him as the person who committed the carjacking.
The rims were recovered at Bender's home and the
Oldsmobile was found in the hills with its tires and stereo
system missing.

Brown contends that trial counsel failed to investigate
and call Simon Mireles to impeach Wood's testimony
concerning the Sunnymead robbery on November 14, 1987,
and to call Gloria Alonza to show that Brown did not commit
the robbery of the Oldsmobile on November 5, 1988.[8]
Specifically, Brown argues that Mireles's testimony would
have helped discredit Woods's testimony that Brown shot

---

[7] Some portions of the record refer to Gloria Alonza as Gloria Alonzo.

[8] To the extent Brown argues that he was prejudiced because counsel
failed to impeach other witnesses to rebut the aggravators, he does not
provide specific details in support of these conclusory assertions. *See
James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations
which are not supported by a statement of specific facts do not warrant
habeas relief.").

Coria, and that testimony by Alonza would have cast doubt that Brown was involved because she excluded Brown from a photo array presented by a defense investigator.

However, both of these potential witnesses would have had minimal impact in rebutting the State's evidence. Mireles's declaration stated that he could not identify either perpetrator of the Sunnymead carjacking and did not know who shot Coria. And while Alonza was able to provide a description of the Black male holding the gun in the November 5, 1988 robbery, the defense investigator reported that Alonza "did not see the second male, whatsoever." As the district court noted, Alonza's testimony would not have excluded Brown from being the second male involved in the robbery.

Trial counsel could have reasonably decided not to call Mireles or Alonza to testify because their statements do not foreclose the possibility that Brown was involved in either robbery. Even if Alonza had testified that she did not believe Brown was the man with the handgun, the impact of her testimony would have been minimized by the contrary testimony of McClendon, who testified that he was in the car when Brown pointed a handgun at Alcarez, Rodriguez, and Alonza and stole their vehicle.

In addition, trial counsel effectively cross-examined several of the State's witnesses and presented rebuttal evidence that cast doubt on the State's case. For example, trial counsel painted Woods as a liar. Although Woods testified that he did not have a gun or know of anyone with a gun on the night of the Sunnymead incident, counsel succeeded in getting the court to take judicial notice of Woods' plea colloquy in which he admitted that he personally used a firearm against both Coria and Mireles in

that robbery.  Further, Woods admitted that he had lied to the police about how the Suzuki was stolen, and lied to a probation officer about his involvement in the crime.

Woods also testified about the Castle Park incident, stating that the same gun was used by Brown in both crimes. After Woods's testimony, trial counsel called a ballistics expert who testified that the bullets recovered from the underlying murder, the Sunnymead incident, and the Castle Park incident were all from different guns.  Counsel also elicited testimony from another witness to the Castle Park incident, who testified that the gunman who shot Carillo was right-handed.  As the parties acknowledge, Brown is left-handed.

As for the attempted robbery of hotel clerk Sharon Lee Baker in January 1988, a police detective testified that Baker gave police a description of the suspect that did not match Brown at the time.  The jury also heard that Baker was unable to identify the robber in a photographic lineup.  In view of the trial record in which counsel presented several witnesses to refute the State's evidence that Brown perpetrated the uncharged offenses, the California Supreme Court reasonably rejected Brown's claim that trial counsel was ineffective for failing to call Mireles and Alonza as rebuttal witnesses. *Strickland*, 466 U.S. at 699.

### b. Failure to Present Brown's Positive Qualities, Request an LWOP instruction, or Object to Closing Argument

Brown's other allegations of ineffective assistance at the penalty phase need only be addressed briefly.  Brown argues that counsel was ineffective for not presenting his positive traits as a caring father and as someone with artistic talent. We find little merit to this claim because prosecutors could

have rebutted this evidence with harmful testimony that Brown did not want to have anything to do with naming his children, that Bennett gave up custody of one child because Brown was using cocaine, and that Brown's children did not know him well. Evidence about Brown's hobbies would have had little persuasive weight to counteract the severity of his crimes. As the district court correctly observed, "[g]iven the heinous nature of the crime, and counsel's apparent strategy at the penalty phase, it cannot be said that their failure to introduce this weak evidence of a redeeming characteristic amounted to the kind of representational failure that *Strickland* contemplates." Thus, we cannot conclude that counsel's exclusion of these positive characteristics amounted to any kind of "gross incompetence" warranting habeas relief. *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

Brown next argues that counsel should have requested a jury instruction defining LWOP and clarifying that LWOP meant that a defendant would never be released from prison. Such an instruction would have been unnecessary. The jury here was instructed that the only two available punishments for Brown was a sentence of death or confinement in state prison for life without the possibility of parole. It is unclear what additional clarification was needed or what such clarification would have accomplished. *See also People v. Ochoa*, 966 P.2d 442, 506 (Cal. 1998) (explaining that the California Supreme Court has recognized that "confinement in the state prison for [LWOP]" is a commonly understood phrase and therefore does not require further instruction as to its meaning).

Finally, Brown asserts that counsel was ineffective for failing to object to or rebut the prosecutor's argument at closing that Brown was a "sociopath" who lacked remorse

and would kill again. Because no evidence supported that he was a sociopath, Brown argues, counsel's failure to object was unreasonable.

A prosecutor commits misconduct during closing argument when he manipulates or misstates the evidence presented at trial. *Darden v. Wainwright,* 477 U.S. 168, 181–82 (1986). As California law recognizes, advocates may employ commonly used terms like "sociopath" in closing argument that are not based on a scientific definition. *See People v. Friend*, 211 P.3d 520, 579 (Cal. 2009) (rejecting claim that counsel should have objected when the prosecutor called the defendant a "sociopath" during argument because "the prosecutor was using language in common currency to describe his interpretation of the evidence"). Reviewing the trial record in this case, the prosecutor permissibly used the term "sociopath" in reference to its everyday meaning and did not refer to a scientific opinion. Because Dr. Kaser-Boyd acknowledged that Brown displayed several characteristics of antisocial personality disorder and explained that some factors, like hyperactivity disorder, "predispose[] children to a variety of problems . . . certainly not just sociopathy," it would have been reasonable for the prosecutor to harken back to this testimony.[9]

---

[9] It would have also been reasonable for Brown's trial counsel to decide not to object in the middle of the prosecution's closing argument. *See United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) ("Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." (citation omitted)); *see also Ceja v. Stewart*, 97 F.3d 1246, 1253–54 (9th Cir. 1996) ("Counsel are given latitude in the presentation of their closing

California law also allows a prosecutor to argue that a lack of remorse implies that the defendant might kill again. *See People v. Boyette*, 58 P.3d 391, 434 (Cal. 2002) (finding permissible the argument "that the facts of the crime showed an absence of remorse and, from that absence, the jury could infer defendant was a threat to kill again"). Several witnesses testified that Brown had bragged to others about shooting Ramirez, and therefore a reasonable inference could be drawn that Brown lacked remorse and was capable of killing again. Because these arguments were permissible under existing caselaw and were based on evidence in the record, counsel was not deficient for failing to object to the prosecutor's closing remarks. *See Juan H. v. Allen,* 408 F.3d 1262, 1273 (9th Cir. 2005) (holding that counsel cannot have been deficient for failing to make a meritless objection).

### c. Prejudice

Because we conclude that counsel's performance was not deficient, we need not address whether Brown was prejudiced by any such deficiency. *Demetrulias v. Davis*, 14 F.4th 898, 915 (9th Cir. 2021)*; see also Strickland*, 466 U.S. at 697 ("Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."). And while Brown asserts cumulative error, because he has not demonstrated ineffective assistance of counsel at

---

arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." (quoting *United States v. Baker*, 10 F.3d 1374, 1415 (9th Cir. 1993))).

the penalty phase, no prejudice can cumulate. *See McGill v. Shinn*, 16 F.4th 666, 685 (9th Cir. 2021) ("If there are no errors, there is no need to consider their cumulative effect.").

## B. Incompetent to Stand Trial

Brown's second certified claim is that his mental impairments rendered him incompetent to stand trial. The California Supreme Court summarily denied his claim, determining that Brown had not demonstrated a prima facie basis for relief. The California Supreme Court's denial of Brown's incompetence claim without an evidentiary hearing was not based on an unreasonable determination of the facts.

Due process prohibits the criminal trial of "a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). "[T]he standard for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)). In California, a criminal defendant is presumed competent and bears the burden of proving incompetency by a preponderance of the evidence. *See* Cal. Pen. Code § 1369(c)(3); *Medina v. California*, 505 U.S. 437, 452–53 (1992). Factors relevant to a competency determination include "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." *Drope*, 420 U.S. at 180.

Brown sought to establish his incompetence by presenting evidence in state court of his "brain damage, low intellectual functioning, mental disorders, and substance abuse." He pointed to Dr. Kaser-Boyd's penalty-phase testimony that, as a result of Brown's severe childhood trauma, he experienced "development arrest" in which "his intellectual ability, his ability to think clearly and to learn new things becomes limited." Brown also relied on Dr. Choo's testimony about Brown's involuntary hospitalization in 1987. Brown was admitted to the emergency room after attempting to steer a car off the freeway and appeared disturbed, agitated, and disoriented. Dr. Choo observed that Brown was "delusional" and "not in contact with reality," stating that "the Crips are after me." Dr. Choo concluded that Brown was psychotic and exhibited unpredictable behaviors, and she prescribed Haldol and four-point restraints for his protection.

Neither expert evaluated Brown for competence to stand trial or connected their assessments to Brown's ability to consult with counsel or understand the nature of the proceedings at the time of trial. Indeed, Dr. Choo noted that just before Brown was released from the hospital, he was mentally clear of the psychotic state and no longer exhibited confusion. Dr. Choo further testified that his psychotic behavior was consistent with his admitted PCP use. It was not unreasonable for the California Supreme Court to conclude that this evidence did not establish a prima facie claim of incompetence. *See Williams*, 384 F.3d at 609 (giving little weight to mental health expert declarations in part because they "do not describe how [defendant's] probable mental impairment interfered with his understanding of the proceedings against him or with his ability to assist counsel in presenting a defense").

Brown also relies upon post-conviction evidence of his poor performance in school and Dr. Watson's neuropsychological testing showing brain damage and intellectual deficits. Dr. Watson conducted further testing of Brown in 2002 to assess his neurological functioning. Dr. Watson concluded that Brown was "functioning within the average range of intellectual ability overall," and had a full scale IQ of 90. His report noted, however, that Brown showed "average to mildly impaired levels of functions" in several neurocognitive domains, and showed "significant signs of executive function impairment," which meant he had slow processing speed and difficulty with "higher-order problem solving and abstract matters." Even crediting these conclusions as true, Brown's weaknesses in processing speed and abstract reasoning do not demonstrate that he was incapable of assisting legal counsel or unable to comprehend the proceedings against him. On the contrary, Dr. Watson noted that during their three interviews in 2002, Brown was friendly, cooperative, and fully oriented. Like the other experts, Dr. Watson did not evaluate Brown for competence, and the neurocognitive impairments he identified do not establish his incompetence to stand trial. *See, e.g.*, *Atkins v. Virginia*, 536 U.S. 304, 318 (2002) ("Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial.").

Brown also seeks to rely on Dr. Stewart's post-conviction psychiatric evaluation of Brown in 2007. Dr. Stewart concluded that at the time of the offense, Brown's mental functioning had been substantially impaired by his history of severe childhood trauma and chronic substance abuse, a stimulant-induced psychotic disorder, and likely mild organic brain dysfunction. Dr. Stewart concluded that Brown "suffered striking and obvious signs of mental

decompensation and psychiatric dysfunction" during this time and that these psychiatric disturbances "may have compromised his ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law." There is no indication from the report, however, that these issues impacted Brown's ability to assist in his defense or understand the proceedings against him. *See United States v. Garza*, 751 F.3d 1130, 1135 (9th Cir. 2014) (emphasizing the need for a clear connection between mental illness, even if severe, and "some failure by the defendant to understand the proceedings or assist in his own defense"); *Boyde v. Brown*, 404 F.3d 1159, 1166 (9th Cir. 2005) (explaining that when paranoid delusions are not related to counsel or any aspect of the trial, they do not indicate incompetence).[10]

On the contrary, the evidence in this case supports the presumption that Brown was competent to stand trial. Under the facts of this case, Brown approached Gardner about buying deep-dish tire rims, then made a plan to steal them, targeted Ramirez's truck, shot her and stole her truck, proceeded to sell the rims, and then bragged about the crime on several different occasions. These circumstances suggest that Brown was able to understand his situation and engage in goal-oriented behavior. The police report from January 1989, which included quotes from Brown's interview with police, also showed that Brown was coherent, intelligible, and rational. *See Williams*, 384 F.3d at 605–06 (finding relevant that the transcripts of defendant's police interview

---

[10] For the same reasons, postconviction evidence that Brown's family and friends observed Brown's increasing drug use and paranoid and self-harming behavior in the two years leading up to the crime does not support a finding that Brown was incompetent to stand trial.

did not "evidence any bizarre or irrational behavior"). In addition, Brown does not contest that neither his trial attorney nor any co-counsel raised an issue about his competence to stand trial. Although not dispositive, this factor weighs against a finding of incompetence. *See id.* at 606 ("[D]efense counsel is in the best position to evaluate a defendant's competence and ability to render assistance." (quotation marks and brackets omitted)). Similarly, there is no evidence that Brown behaved strangely in the courtroom and the trial court did not raise any concerns about his competence. We have "deem[ed] significant the fact that the trial judge, government counsel, and [defendant's] own attorney did not perceive a reasonable cause to believe [defendant] was incompetent." *Hernandez v. Ylst*, 930 F.2d 714, 718 (9th Cir. 1991); *see also Douglas v. Woodford*, 316 F.3d 1079, 1094 (9th Cir. 2003) (noting that the defendant "did not exhibit any strange behavior in the courtroom, nor did the prosecutor or trial judge express any concerns about his competence" and concluding that he was not entitled to an evidentiary hearing on competence). Based on the totality of the evidence, we conclude that the California Supreme Court did not make an unreasonable factual determination that Brown failed to rebut the presumption of competency.

## C.  Eighth Amendment Claim

Brown's third certified claim is that he has an intellectual disability that renders him ineligible for execution under the Eighth Amendment. Brown points to (1) his pre-trial neuropsychological testing with Dr. Nunno, which showed "a general pattern of intellectual dysfunction and academic skill deficiencies," (2) Dr. Watson's opinion that Brown had "long-standing mild organic dysfunction, with significant signs of executive function impairment," and (3) his

consistently low grades and recommendation for special education services as indicators of adaptive deficits.

In *Atkins v. Virginia*, the Supreme Court held that it was unconstitutional to execute an intellectually disabled person and "le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." 536 U.S. 304, 317 (2002) (quoting *Ford v. Wainwright*, 477 U.S. 399, 416–17 (1986)). Following *Atkins*'s instruction, the California legislature adopted clinical definitions of intellectual disability, which require (1) "significantly subaverage general intellectual functioning," and (2) "deficits in adaptive behavior" that (3) "manifested before the end of the developmental period." Cal. Pen. Code § 1376(a)(1); *accord Atkins*, 536 U.S. at 318 ("[C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18.").

The California Supreme Court reasonably determined that Brown failed to make a prima facie showing of intellectual disability under California's three-factor statutory test. As an initial matter, Brown has adduced no medical expert declaration concluding that Brown has an intellectual disability, much less one that explains how any organic brain damage or other deficit satisfies the statutory standards. *See Ochoa*, 50 F.4th at 903 (rejecting the "contention that *Atkins* bars the execution of individuals with an impairment 'equivalent' to intellectual disability").

Nor has Brown presented evidence that he has "significantly subaverage general intellectual functioning" under prong one of the *Atkins* test. Cal. Pen. Code

§ 1376(a)(1); *see Atkins*, 536 U.S. at 318.   Although there is no fixed IQ cutoff to establish intellectual disability in California, *see In re Hawthorne*, 105 P.3d 552, 557 (Cal. 2005), the range of IQ scores that "clinical sources consider as satisfying *Atkins* prong one" is "approximately 65 to 75," *Ochoa*, 50 F.4th at 903; *see also Atkins*, 536 U.S. at 309 n.5 ("It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.").

Brown obtained a full-scale IQ score of 77 from Dr. Nunno's testing in 1991, prior to trial.  Reviewing those test results, Dr. Kaser-Boyd testified that Brown's overall intellectual functioning was at the level of a twelve- or thirteen-year-old, consistent with his school records.  That placed him in "borderline intelligence," the area between low average intelligence and intellectual disability.  When Brown was retested by Dr. Watson in 2002, he had a full-scale IQ score of 90.  Dr. Watson opined that "Brown is functioning within the average range of intellectual ability." Specifically, Brown scored on the average or low average range for Verbal IQ (37th percentile), Performance IQ (16th percentile), Verbal Comprehension Index (34th percentile), Perceptual Organization Index (23rd percentile), and Working Memory Index (37th percentile), with his lowest score registering at 76 in Processing Speed Index (5th percentile).  Brown's two overall IQ scores, Dr. Watson's declaration, and Dr. Kaser-Boyd's penalty-phase testimony do not support a finding that Brown has significantly subaverage intellectual functioning.

As for prong two of the *Atkins* test, the California Supreme Court requires that a petitioner demonstrate adaptive deficits consistent with the current clinical

definition of intellectual disability, citing with approval standards set by the American Psychiatric Association ("APA"). *Hawthorne*, 105 P.3d at 556–57. These standards require evidence of "significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Id.* at 557. Such assessment is generally derived from standardized measurements. *See* Diagnostic and Statistical Manual of Mental Disorders ("APA DSM-IV") 80 (4th ed. 2000) (recognizing that adaptive functioning scales "generally provide a clinical cutoff score that is a composite of performance in a number of adaptive skill domains").

Brown contends that he has met the APA standards and highlights Dr. Watson's opinion that Brown appeared to have "mild neurocognitive impairments" and "learning disabilities with deficits in spelling, arithmetic and reading speed," as reflected in his low grades and recommendation for special education services. However, Dr. Watson's report did not purport to evaluate Brown's adaptive behavior through standardized measures, nor did Dr. Watson conclude that Brown had significant limitations in adaptive functioning, explain what those deficits were, or discuss how Brown's sociocultural background would affect that assessment. *See In re Lewis*, 417 P.3d 756, 767 n.15 (Cal. 2018) (observing that significant limitations on adaptive behavior are found using standardized testing). Although Brown struggled in school, his poor academic performance could be the result of many other factors—including childhood abuse, PTSD symptoms, family and environmental turmoil, and early substance use—rather than intellectual disability. *See, e.g.*, *Pizzuto v. Yordy*, 947 F.3d

510, 531 (9th Cir. 2019) ("Although some of these records show that [defendant] received low grades and was held back, there are many reasons [he] may have performed poorly in school, and no expert opined that this poor performance was evidence of [intellectual disability]."). With scant evidence as to whether Brown demonstrated significantly subaverage general intellectual functioning or was deficient in adaptive skills, the California Supreme Court reasonably determined that Brown did not state a prima facie claim for relief under *Atkins*.

## V. Uncertified Claims

Brown seeks to expand the COA to include three uncertified claims, alleging (1) counsel's ineffective assistance at the guilt phase, (2) the discriminatory exclusion of a prospective black juror, and (3) the denial of a jury drawn from a fair cross-section of the community. We may not review Brown's uncertified claims unless a COA is granted. *See* 28 U.S.C. § 2253(c)(1)(A). A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). To obtain a COA, Brown must show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 580 U.S. 100, 115 (2017) (citation omitted). "This threshold question should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'" *Id.* (citation omitted). For the reasons that follow, we decline to grant COAs as to Brown's uncertified claims.

## A. Ineffective Assistance of Counsel at the Guilt Phase—Claims 7 & 11

Brown first argues that counsel was ineffective at the guilt phase for failing to investigate his competency and failing to present alternative mental state defenses. As discussed, trial counsel did investigate Brown's mental state and did not ignore any indicia of his mental limitations. *See supra*, pp. 29–31. In light of our evaluation of Brown's substantive incompetence claim, *see supra* Section IV.B, the California Supreme Court's denial of his ineffective assistance of counsel claim based on counsel's failure to investigate his competency was not unreasonable. *See Davis v. Woodford*, 384 F.3d 628, 647 (9th Cir. 2004) (holding that because petitioner failed to establish incompetence, his corresponding ineffective assistance of counsel claim also fails).

Evidence in the record also supports the presumption that counsel reasonably declined to pursue a Not Guilty by Reason of Insanity plea or present a defense that Brown could not form the specific intent to commit murder. The facts of the crime suggested that Brown understood the nature of his acts and was capable of planning and executing goal-oriented behavior. Further, a mental state defense would have contradicted the defense theory presented at trial that Brown was not the shooter—a defense supported by some inconsistency in witness statements. *See Turk v. White*, 116 F.3d 1264, 1267 (9th Cir. 1997) ("[O]nce [counsel] reasonably selected the self-defense theory, his duty to investigate the competency defense, which directly conflicted with the self-defense theory, ended."). Because reasonable jurists could not disagree with the district court's decision to deny these claims, we decline to expand the COA

to include these uncertified issues.  *See Buck*, 580 U.S. at 115.

## B.  *Batson* **Claim—Uncertified Claim 2**

Brown also seeks to expand the COA to challenge the prosecutor's use of a peremptory strike against a prospective Black juror under *Batson v. Kentucky*, 476 U.S. 79 (1986). We follow a three-part burden-shifting test for assessing a *Batson* claim of racial discrimination in jury selection:

> First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.  Second, once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes.  Third, if a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination.

*Johnson v. California*, 545 U.S. 162, 168 (2005) (cleaned up).

The juror stated during voir dire that "a cold blooded murder of someone is the only reason I'd vote for the death penalty."  After the prosecutor explained the felony murder rule, the juror maintained his reluctance to impose the death penalty for an accidental shooting.  He also showed confusion about the death penalty standard, repeating his belief that the prosecutor must prove the propriety of a death sentence beyond a reasonable doubt and requiring multiple

explanations by the trial judge before accepting the correct standard. The prosecutor exercised a peremptory strike against the juror and defense counsel raised a *Batson* objection. On two different occasions, the trial court found no prima facie showing of racial discrimination and noted that the prosecutor had concerns with the juror during voir dire and had unsuccessfully challenged him for cause. On this record, Brown has not established that the California Supreme Court's denial of his *Batson* claim "was contrary to[] or involved an unreasonable application of" *Batson*. 28 U.S.C. § 2254(d)(1).

As a final matter, Brown argues that we must look through the California Supreme Court's summary denial in 2008 to the last-reasoned trial court decision in 1991, during which time California required a prima facie showing of "a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." *People v. Wheeler*, 583 P.2d 748, 764 (Cal. 1978). In 2005, the Supreme Court rejected *Wheeler*'s "strong likelihood" standard as inconsistent with *Batson*'s "inference" requirement. *Johnson*, 545 U.S. at 173. Although the trial court rendered its decision in 1991 when *Wheeler* governed, the California Supreme Court summarily denied Brown's petition in 2008, after *Johnson* had clarified the governing *Batson* prima facie standard. Where, as here, there was an intervening change in law between the time of the lower state court ruling and the California Supreme Court decision, we presume that the California Supreme Court followed the correct standard under *Johnson* and *Batson*. *See Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

Under these facts, the district court's decision to deny Brown's *Batson* claim is not "debatable." *Buck*, 580 U.S. at 116 (citation omitted).

## C. Sixth Amendment Fair-Cross-Section Claim— Uncertified Claim 1

Finally, Brown seeks expansion of the COA to raise a Sixth Amendment claim on his "right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010). Brown argues that there was a systemic underrepresentation of Black and Hispanic populations in the Riverside County jury pool at the time of his trial.

To establish a prima facie violation of the fair cross-section requirement, a defendant must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979). To make a prong two showing, Brown provided a declaration by sociologist Dr. Edgar Butler, who compared the jury venires in three unrelated trials in Riverside County in 1987 and 1988 with the underlying population in Riverside County. However, Brown presented no statistics on the racial composition of the venire from which his jury was drawn in November 1991. Dr. Butler's examination of three prior trials cannot substitute for jury selection data at Brown's trial. Accordingly, reasonable jurists could not disagree with the district court's resolution of Brown's Sixth Amendment fair-cross-section claim. *See Buck*, 580 U.S. at 115.

\*\*\*

Because Brown failed to demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further," *id.* (citation omitted), we decline to grant COAs for Brown's three uncertified claims.

## VI. CONCLUSION

Under AEDPA's deferential standard of review, Brown has not demonstrated that the California Supreme Court's summary denial of his claims "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Therefore, we must affirm the district court's judgment denying Brown federal habeas relief.

**AFFIRMED.**